ESTATE OF MELVIN GOLDBERGER, DECREASED, BERTHA GOLDBERGER, EXECUTRIX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Goldberger v. Commissioner
Docket No. 332-72.
United States Tax Court
T.C. Memo 1974-21; 1974 Tax Ct. Memo LEXIS 296; 33 T.C.M. (CCH) 95; T.C.M. (RIA) 74021; January 29, 1974, Filed. Nelson S. Weine and Thomas G. A. Herz, for the petitioner. Matthew W. Stanley, Jr., for t he respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION
SCOTT, Judge: Respondent determined a deficiency in estate tax of petitioner in the amount of $2,667.14. Some of the issues raised by the pleading have been disposed of by agreement of the parties leaving for our decision whether the decedent's transfer of 2 eleven life insurance policies to an irrevocable inter vivos trust within three years of the date of his death was made in contemplation of death and whether the fair market value of decedent's furniture and household effects exceeded $850.
FINDINGS OF FACT
Some of the facts have been stipulated and are found accordingly.
Petitioner is the Estate of Melvin Goldberger who died on November 9, 1967. *297 Letters testamentary were granted to Bertha Goldberger (Bertha), decedent's widow and executrix of his estate, by the Probate Division of the County Court, Milwaukee, Wisconsin on November 17 1967. An estate tax return was filed for decedent's estate with the district director of internal revenue at Milwaukee, Wisconsin.
On July 1, 1966, when decedent was 75 years old, he executed a last will and testament which provided that his household effects were to pass to Bertha upon his death and the remainder of his property, with a few exceptions, was to pass to an irrevocable trust which was also established that same date. The trust which was created provided that the net income, if any, 3 earned during decedent's lifetime would be accumulated and that upon his death the trust corpus would be divided into two trusts, one trust qualifying for the marital deduction and the other trust not qualifying for the marital duction. Bertha was to receive the income from both of these trusts.
On the date of the creation of this trust, decedent transferred and assigned the following life insurance policies to the lifetime trustee of the trust: Insuror
Policy Number Northwestern MutualLife Insurance Co.
2199805
Northwestern MutualLife Insurance Co.
1781249
New York Life Insurance Co.
11-701-201
New York Life Insurance Co.
11-279-519
New England Mutual Life Insurance Co.
285816
New England Mutual Life Insurance Co.
286291
New England Mutual Life Insurance Co.
1,103,148
New England Mutual Life Insurance Co.
1,103,149
The Prudential Insurance Co. of America
11-336-643
The Prudential Insurance Co. of America
4738750
*298 On July 1, 1966, the date on which the decedent executed the trust agreement, the cash surrender value of the life insurance policies transferred to the trust was the amount of $23,891.18. Decedent filed a Federal gift tax return on April 14, 1967, to reflect this gift in trust. 4 Within 19 months of the transfer of the life insurance policies to the trust, decedent died from a cardiac arrest due to coronary arteriosclerosis with multiple myocardial infarcts.
In 1954 decedent suffered a myocardial infarction (heart attack) which required his hospitalization for about one week. Decedent was 63 years old at that time. A myocardial infarction is the death of tissue in the heart, often resulting from the blockage of blood vessels to the portion of the heart that is affected. The tissue can often rejuvenate, leaving a scar. Decedent was advised by his cardiologist, that he could return to work on a limited schedule about six weeks after he was hospitalized for the heart attack.
Decedent began suffering from a mild case of angina pectoris in about 1957. His cardiologist prescribed nitroglycerine and Peritrate for his disease and decedent at that time would use about 50 tablets *299 of nitroglycerine every 3 months. He continued thereafter until his death to use nitroglycerine on an infrequent basis and to use Peritrate twice daily.
In 1962 decedent decided to retire, having reached the age of 71. He sold his business, a haberdashery. He soon discovered that he could not 5 stand retirement, so he went back to work for his old competitors, first MacNeil and Moore and then Chapman Company, and was working for the latter at the time he entered the hospital in 1967 shortly before his death.
When decedent owned his own store he worked the full work day plus extra hours. At one time prior to 1962 decedent borrowed against his insurance policies to obtain funds for his business. When he returned to work after his brief retirement he worked two or three days a week from early in the morning until about 4:00 in the afternoon. His job was being a floor salesman and when he was not with a customer he would invariably be straightening up the merchandise on display.
Up until 1965, decedent mowed and tended to the landscaping of the lawn at his home which was situated on a quarter-acre lot. Decedent and Bertha went for a walk every evening.
In 1965, decedent *300 and Bertha went to Mexico for a one-month vacation. In 1956, they went to Key West, Florida for a two-month vacation. In 1957, they went to Phoenix, Arizona for a three-week vacation. In 1964, they visited their son in San Francisco and stayed for three or four weeks. On this vacation decedent walked the streets of San Francisco, walked in the National parks in the redwood forest and completed the walking tour through the San Simeon estate, the latter being a rather strenuous walk of about 40 minutes' duration. 6 In 1967 decedent decided to undergo surgery to repair an inguinal hernia. He had planned to have this operation performed 3 years earlier but had delayed it for unknown reasons. Both decedent's son, a surgeon, and his cardiologist, felt no danger could result from this surgery and the latter characterized decedent's heart condition as "quite stable." Upon entering the hospital for this operation, decedent was examined by a surgeon who determined that he should undergo a prostatectomy, again delaying the hernia repair.
On November 2, 1967, the prostatectomy was performed. On November 5, 1967, decedent developed shock which was caused by a fresh myocardial infarction. *301 On November 9, 1967, decedent's heart stopped functioning and he died, being 76 years old.
Decedent and Bertha had two sons and a daughter. Decedent made loans to each of his children on a regular basis. None of these loans was repaid but interest was paid by the children and one son formalized his indebtedness by giving decedent a promissory note.
The trust which decedent created on July 1, 1966, provides that decedent would have the sole responsibility of paying premiums on the life insurance policies 7 transferred to the trust. On decedent's death the trustee was to collect the proceeds of the life insurance policies and place a sufficient amount of those proceeds together with other trust property and the assets received from decedent's estate into a separate trust (referred to as Trust A) so that decedent's estate would qualify for the maximum marital deduction under the Federal estate tax laws. Bertha was to receive at least annually the net income from Trust A and she was given the power to invade the corpus of Trust A. Bertha was also given a general power of appointment with respect to the assets in Trust A.
The remaining assets in the trust (or all the assets if *302 Bertha did not survive decedent) were to be held in a separate trust (referred to as Trust B). Bertha was to receive all of the net income from Trust B and so much of the corpus as the trustee should deem advisable for her care, comfort, welfare, convenience and general benefit.
Upon the death of Bertha, the assets remaining in Trust B (together with the assets remaining in Trust A if Bertha failed to exercise her general power of appointment) would be divided in three equal parts with each then-living child of decedent's receiving one-third of the corpus together with one-third of any 8 undistributed trust income. If any of the three children predeceased Bertha, that child's share was to be held in trust for any surviving issue.
Bertha was under the impression that decedent placed the life insurance policies in trust so as to put them beyond his reach in the event he might be tempted to borrow against the policies, especially in the event of a prolonged illness. Bertha was also under the impression that decedent took this step for his own peace of mind and for the protection of Bertha. Decedent told one of his sons that he had created the trust to insure that his children *303 would share in his estate at the time of Bertha's death.
In 1965 decedent and Bertha moved from a three-bedroom residence to a one-bedroom apartment. When they moved they sold a great amount of their furniture.Following decedent's death, Bertha moved into her daughter's home. Most of the furniture in the apartment was moved to the daughter's home where it now is located. The fair market value of the furniture, dining room table, day bed, everyday dishes, pots and pans and silverware was $855 on the alternate valuation date for valuing decedent's estate. The fair market value of decedent's clothing, pictures and paintings, bric-a-brac and linens is $145. 9 On Melvin's death, the face value of the life insurance policies which he had transferred to the trust on July 1, 1966, was $38,462.79.
On December 1, 1969, the Wisconsin State Department of Revenue and petitioner filed a stipulation with the Probate Division of the Milwaukee County Court in connection with a proceeding brought by the Department of Revenue for the redetermination of inheritance taxes due from the estate. The Department of Revenue contended that the trust agreement executed by decedent on July 1, 1966, constitutes *304 a transfer which takes effect at death and thus subject to the Wisconsin inheritance tax. The stipulation provided, among other things, "That it is agreed that the Trust Agreement was not in contemplation of death."
Respondent determined that the transfer of the life insurance policies to the irrevocable trust by decedent was a gift made in contemplation of death and that the value of the gift is includable in decedent's gross estate. Respondent further determined that the fair market value of the personal items and household furnishings owned by decedent at his death was $4,000.
OPINION
Section 2035, I.R.C. 1954, provided that:
The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent 10 has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death.
The Supreme Court discussed the phrase "in Contemplation of death" in United States v. Wells, 283 U.S. 102 (1931), at 115:
* * * the reference is not to the general expectation of death which all entertain. It must be *305 a particular concern, giving rise to a definite motive. * * * The quality which brings the transfer within the statute is indicated by the context and manifest purpose. Transfers in contemplation of death are included within the same category, for the purpose of taxation, with transfers intended to take effect at or after the death of the transferor. The dominant purpose is to reach substitutes for testamentary dispositions * * * As the transfer may otherwise have all the indicia of a valid gift inter vivos, the differentiating factor must be found in the transferor's motive. Death must be "contemplated," that is, the motive which induces the transfer must be of the sort which leads to testamentary dispostion * * *
As the test, despite varying circumstances, is always to be found in motive, it cannot be said that the determinative motive is lacking merely because of the absence of a consciousness that death is imminent. It W01161600201532is contemplation of death, not necessarily contemplation of imminent death, to which the statute refers. * * * The words, "in contemplation of death" mean that the thought of death is the impelling cause of the transfer * * *.
Whether a certain *306 transaction was a gift made in contemplation of death is a factual determination. p11 Allen v. Trust Co. of Georgia, 326 U.S. 630 (1946). Respondent contends that in addition to the statutory presumption that decedent's gift was made in contemplation of death, there is the uncontroverted evidence that decedent executed his last will and testament on the same day as the creation of the trust, that decedent was 75 years old when he made the gift, that the property transferred was a group of life insurance policies and that decedent had suffered a heart attack several years earlier.
Petitioner contends that decedent was a healthy man when he made the gift, that the life insurance policies had substantial cash values and that the Probate Division of the Milwaukee County Court found that the gift was made not in contemplation of death. Bertha testified that decedent's motive for making the transfer was to isolate the property - to place the life insurance policies beyond his reach so that he could not borrow against them in the event of a long illness. Decedent's son testified that decedent created the trust to insure that his children would share in his estate following *307 the death of Bertha.
It is necessary for us to determine from the evidence whether any of the motives which prompted decedent's gift were motives associated with things of 12 life and, if so, whether that motive associated with life is predominant over a motive associated with death. United States v. Wells, supra; Estate of Verne C. Hunt, 14 T.C. 1182 (1950).
Assuming that decedent's predominant motive was to isolate the property from himself, it is necessary to consider whether the hazard which Bertha stated decedent foresaw is one which would indicate a motive associated with life. Bertha testified that decedent wanted to put the cash surrender value of the insurance policies beyond his control should he have an extended illness with its accompanying expenses. When this motive of decedent's is considered together with his age at the time he made the transfer, in our view it is not a motive associated with thoughts of life but rather with thoughts of death.
The second motive attributed to decedent was that he wanted to insure that his three children shared in his estate following Bertha's death. The terms of the trust decedent created clearly show *308 that such a sharing could not occur until decedent's death as well as Bertha's death. It is clear that this motive is also associated with a testamentary disposition rather than things associated with living. 13 While petitioner strongly contends that decedent was healthy when he made the gift, it appears that he feared a long and expensive illness. Such a premonition effectively rebuts petitioner's contention, especially when the donor is age 75 and had some history of serious illness.
The cases cited by petitioner are distinguishable on their facts from the instant case, whether a gift is in contemplation of death requires a factual determination. In each case the trier of fact must determine from the decedent's behavior, actions, and expressions the impelling motivation for the gift. Although certain fact patterns emerge, no case is the duplicate of another. [1]
*309 We do not consider it necessary in this case to rely, to support our conclusion that the transfer of the insurance policies to the trust was in contemplation of death, upon the testamentary character of life insurance policies. In our search for the governing motivation we need look only to the nature of the 14 statements made by decedent to his wife and son and decedent's age and medical history. The evidence of record is insufficient to establish that decedent was motivated by thoughts of living and accordingly we find that his transfer of the life insurance policies to the trust was a gift made in contemplation of death.
There is insufficient evidence for us to evaluate the nature of the proceeding involving the petitioner's liability for the Wisconsin inheritance tax.The parties in that case stipulated that it was agreed "that the trust agreement was not in contemplation of death." What evidence, if any, other than this stipulation led the Probate Court to its decision, if in fact the decision were made in an adversary proceeding, is not shown by the record.
Because of respondent's concession on brief, all that remains at issue with respect to the value of decedent's furniture *310 and household affects is the value of decedent's clothing, pictures, bric-a-brac and linens. Respondent now contends these items have a fair market value at the alternate valuation date of $145. Petitioner recognizes a value on other items asserting that the clothing had value only to the people who received it. Inasmuch as the evidence shows that decedent was employed 15 as a salesman in a men's clothing store up until the date of his death, we consider respondent's determination as adjusted by concessions that decedent's wardrobe had a fair market value of $145 on the alternate valuation date to be justified. Accordingly, we find that the fair market value of the items in issue which were not included in decedent's gross estate is $1,000 and not $855 as contended by petitioner.
Decision will be entered under Rule 155. Footnotes
1. Petitioner's reliance on Estate of Lewis W. Barton, T.C. Memo. 1972-30↩, is misplaced. The decedent, in that case saw no need to continue to pay premiums for life insurance, which he viewed solely as an investment and a bad one at that, following the sudden death of his wife. He transferred the policies to an unfunded trust solely at the insistence of his family lawyer.No further premiums were paid on the policies. Decedent was 48 years old at the time he made the transfer and in superb health. His death was totally unexpected.